**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CHICAGO REGIONAL COUNCIL OF CARPENTERS, UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA and EDWARD CASPER, | )<br>)<br>)<br>)<br>) | No. 12 C 3604 |
| Plaintiffs, | )<br>) | Judge Ronald A. Guzmán |
| v. | )<br>) | |
| BERGLUND CONSTRUCTION CO., | )<br>) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

On September 13, 2013, the Court granted defendant's motion for summary judgment and denied plaintiffs' motion on Casper's ADEA claim and the Union's claim that defendant violated § 12112(d) of the ADA. (*See* Mem. Op. & Order (Sept. 13, 2013).) Plaintiffs do not take issue with the ruling on the ADEA claim but contend that the Court wrongly construed the ADA claim and ask the Court to reconsider its ruling on that claim. The Court agrees, and thus revisits the ADA claim in Count II.

**Facts**

Viewed favorably to plaintiffs, the record shows that Casper worked for Berglund from 2007 until November 2009, when he was laid off for lack of work. (Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 34.)

In April 2008, Berglund implemented a policy that states "all persons applying for employment in Illinois for field positions will be required to successfully complete a functional employment test." (Def.'s LR 56.1(a) Stmt., Ex. 7, Policy Regarding Post Offer Pre-Hire Tests.)

The policy does not define "field positions" or "persons applying for employment." (*See id*.) However, defendant states that anyone who has not "be[en] a Berglund employee" for sixty days, is subject to the policy. (Def.'s LR 56.1(a) Stmt. Ex. 3, Geshwender Dep. at 18-19.)

In June 2010, Daniel Nyblom, who was managing a Berglund job at the Dirksen Courthouse, asked another Berglund manager, Dave Kordeck, for more carpenters and specifically requested that plaintiff Casper be hired. (Def.'s LR 56.1(a) Stmt., Ex. 2, Nyblom Decl. ¶¶ 2-9.) Kordeck called Casper and told him to go to Accelerated Rehabilitation Center ("Accelerated")[1] for an evaluation and then "report to Berglund's offices immediately after . . . for orientation and to begin work." (*Id.*, Ex. 1, Kordeck Decl. ¶¶ 9-11; *see* Def.'s LR 56.1(a) Stmt., Ex. 9, Casper Dep. at 34-35 (testifying that Kordeck told him, "[Y]ou got to take this test, . . . . [a]nd after you're done, come to the office for an orientation and we'll get you going.").) Nyblom and Kordeck say they "intended for Casper to begin work immediately at the Dirksen job if he successfully completed" the Accelerated evaluation. (Def.'s LR 56.1(a) Stmt., Ex. 1, Kordeck Decl. ¶ 12; *id.*, Ex. 2, Nyblom Decl. ¶ 10.)

On June 28, 2010, Casper went to Accelerated, filled out some paperwork and was given a drug test. (Pls.' LR 56.1(a) Stmt. ¶¶ 5-6.) He was then examined by Paul Sullivan, a physical therapist, and Brian Conroy, an athletic trainer, who tested, among others things, Casper's lifting ability. (*Id.* ¶¶ 7, 10-13.) To "pass" the lifting portion of the test, Casper had to lift 94 pounds safely. (*See* Def.'s LR 56.1(a) Stmt., Ex. 8, Carpenter Job Specific Task List.) Though plaintiffs disagree with his conclusion, there is no dispute that Sullivan believed Casper could not safely lift over 68 pounds. (Def.'s LR 56.1(a) Stmt., Ex. 4, Sullivan Dep. Feb. 25, 2013 at 120; Pls.' LR 56.1(a) Stmt., Sullivan Dep. Mar. 21, 2013 at 188-89.)

---

[1]At the time, Accelerated was known as OccuSport.

After Casper left Accelerated, he went directly to Berglund's main office with his hard hat and safety glasses. (Def.'s LR 56.1(a), Ex. 9, Casper Dep. at 72-73) He assumed he would fill out some paperwork, learn about the Dirksen job and immediately start work. (*Id.* at 72.) When he arrived, however, Kordeck's assistant told plaintiff he had not passed the Acceleration test. (*Id.* at 73-75.) Casper asked Kordeck what part of the test he had failed and what he had to do to pass it. (*Id.* at 76-77.) Kordeck said Accelerated did not break the test results down but simply told Berglund it whether someone had passed or failed. (*Id.* at 77.) He also told Casper that he would have to wait sixty days to be retested. (*Id.*)

Sixty days later, when Casper called about retesting, Kordeck said Berglund was no longer hiring. (*Id.* at 84.)

## Discussion

The Union alleges that Berglund's use of the Accelerated test is a pre-offer medical test prohibited by the ADA.[2] *See* 42 U.S.C. § 12112(d)(2) (barring an employer from "conduct[ing] a medical examination or mak[ing] inquiries of a job applicant as to whether [he] is an individual with a disability"). However, an employer may, after offering an applicant a job, require him to take a medical exam and make the job offer contingent on his passing it, as long as the employer requires all entering employees in the same job category to do so as well. *See* 42 U.S.C. § 12112(d)(2), (3); 29 C.F.R. § 1630.14(b). Plaintiffs contend that Berglund had not made a "real" job offer to Casper before sending him to Accelerated, and thus the post-job offer exception does not apply.

---

[2]As the Court noted in the September 13, 2013 order, the Union has standing to assert this claim. (*See* Mem. Op. & Order (Sept. 13, 2013) at 2 n.1.)

"For purposes of § 12112(d)(3), a job offer is real if the employer has evaluated all relevant non-medical information that it reasonably could have obtained and analyzed prior to giving the offer." *O'Neal v. City of New Albany*, 293 F.3d 998, 1008 (7th Cir. 2002) (quotations omitted). "Accordingly, if a job offer is conditioned not only on the applicant successfully passing a medical examination but also a myriad of non-medical screening tests, the offer is not real." *Id.* Viewed favorably to plaintiffs, there is no evidence that suggests Berglund's offer was not real. On the contrary, it is undisputed that Nyblom, Kordeck and Casper, who took his safety equipment with him when he reported to Berglund after the Accelerated test, all believed that Casper would be put to work immediately. Plaintiffs have not, therefore, created a triable fact issue as to the authenticity of Berglund's pre-testing job offer to Casper.

Even if the job offer was real, the Union argues that the exception still does not apply because Berglund did not require all entering employees to take the Accelerated test. Plaintiffs contend that Berglund hired 68 Union members who had one or more breaks in service of 60+ days without requiring them to undergo testing, as demonstrated by plaintiffs' summary of hiring and test dates. (*See* Pls.' LR 56.1(a) Stmt., Summ. Hire & Test Dates.) However, plaintiffs' summary does not show any service breaks for eight of the people listed (Richard Anderson, Tyler Anderson, Michael Buchholz, Tom Higgins, Ewald Leschkles, Richard Stephens, Larry Vick and Kyle Whisker) and defendant offers uncontradicted evidence that seven others (Ronald Ammons, James Ballard, Stephanie Berglund, Martin Burba, Eric Green, Richard Micklow and Jay Patz) did not work as carpenters, and thus were not subject to the testing policy. (*See id.*; Def.'s LR 56.1(b)(3)(C) Stmt., Ex. 5, Table of Hires; *id.*, Ex. 7, Geshwender Decl. ¶¶ 7-12.) As to the 53 remaining carpenters that plaintiffs contend should have been tested, defendant offers uncontradicted evidence

that: (1) many of them had one or more service breaks of 60 days or less;[3] (2) others had service breaks that occurred before the testing policy went into effect;[4] (3) some of the 60+ day service breaks reflect retroactive pay adjustments;[5] and (4) many of the employees with 60+ day service breaks were, in fact, tested by Accelerated.[6] That leaves twenty-two carpenters who had one or

---

[3](*See* Def.'s LR 56.1(b)(3)(C) Stmt., Ex. 5, Table of Hires (Brian Anderson (57-day break from 2/8/09 to 4/5/07 and 58-day break from 8/17/10 to 10/14/10), Daniel Barton (45-day break from 1/31/10 to 3/16/10), James Brazelton (59-day break from 2/22/09 to 4/23/09 and 58-day break from 5/3/09 to 6/29/09), Michael Bremer (60-day break from 2/8/09 to 4/8/09), Gonzalo Cazares (57-day break from 8/24/08 to 11/2/08), Thomas Chambers (44-day break 12/12/20 to 2/13/11), Tom Duncan, (57-day break from 6/29/08 to 8/24/08), Ismael Estrada (57-day break from 3/30/08 to 5/25/08), William Fritz (53-day break from 5/10/09 to 7/1/09), Kenneth Gales (60-day break from 4/13/08 to 6/11/08 and 57-day break from 8/24/08 to 10/19/08), Sergio Garcia (36-day break from 6/27/10 to 8/1/10), Jason Jendreas (57-day break from 1/10/10 to 3/7/10), Robert Kurek (57-day break from 2/15/09 to 4/12/09), Joshua Michaels (60-day break from 2/15/09 to 4/15/09), Edgaldo Nieves (60-day break from 2/15/09 to 4/15/09), Derek O'Brien (57-day break from 2/8/09 to 4/5/09), Jerry Rhodes (57-day break from 4/6/08 to 6/1/08 and 51-day break from 10/13/09 to 12/20/09) and James Tuman (57-day break from 9/7/08 to 11/2/08).)

[4](*See id.* (Vincente Carbajal (break from 7/8/07 to 10/7/07), Ismael Estrada (break from 12/16/07 to 2/17/08), Sam Goff (break from 11/13/07 to 2/17/08), Kevin McKinley (break from 9/9/07 to 3/24/08), Derek O'Brien (break from 9/16/07 to 2/3/08 ), Norge Roi (break from 1/21/07 to 4/29/07) and James Tuman (break from 9/16/07 to 3/9/08).)

[5](*See id.* (Brian Anderson (break from 10/11/09 to 1/17/10), Peter Brands (break from 10/8/09 to 1/14/10), Michael Bremer (break from 10/11/09 to 1/14/10), Vincente Carbajal (break from 11/15/09 to 1/17/10), Sam Goff (break from 11/10/09 to 1/14/10), Robert Kurek (break from 10/11/09 to1/14/10) and Shiloh Rhodes (break from 10/18/09 to 1/14/10); *id.*, Ex. 7, Geshwender Decl. ¶ 6).)

[6](*See* Def.'s LR 56.1(b)(3)(C) Stmt., Ex. 5, Table of Hires (Brian Anderson (break from 2/3/10 to 7/4/10), James Ball (breaks from 12/20/09 to 4/11/10, 12/5/10 to 3/27/11 and 12/18/11 to 7/29/12), Daniel Barton (breaks from 12/12/10 to 3/6/11 and 1/15/12 to 6/17/12), James Brazleton (break from 1/17/10 to 7/25/10), Peter Brands (break from 1/31/10 to 8/8/10), Dean Campbell (break from 10/31/10 to 5/1/11), Jim Costello (break from 12/13/10 to 3/27/11), Howard Doty, (break from 12/12/10 to 3/20/11), Sergio Garcia (breaks from 12/13/09 to 5/26/10 and 12/5/10 to 4/1/11), Jason Hinjosa (breaks from 1/31/10 to 7/18/10 and 11/28/10 to 4/10/11), John Kennedy (break from 4/11/10 to 6/20/10), Cesar Lagunas (breaks from 12/14/10 to 4/3/11 and 12/27/11 to 8/19/12), Jason Myers (break from 2/3/10 to 7/4/10), Derek O'Brien (break from 10/20/09 to 8/8/10), Randall Rapcheck (break from 10/23/11 to 8/26/12), Christopher Rassbach

more bona fide 60+ day service breaks[7] that Berglund rehired without testing.[8,9] Because the record suggests that Berglund did not apply the testing policy to all incoming carpenters, there is a genuine

---

(break from 9/25/11 to 4/8/12), Jerry Rhodes (break from 12/12/10 to 3/6/11), Shiloh Rhodes (break from 12/12/10 to 3/27/11), Norge Roi (break from 1/10/10 to 4/11/10), John Sandula (break from 10/6/10 to 8/5/12), James Slagel (break from 12/12/10 to 5/8/11), Carlos Vasquez (break from 12/19/10 to 7/1/12), Mike Wallenda (break from 4/6/08 to 11/22/09), William Walzak (break from 10/24/10 to 3/27/11), Carter Ware (break from 11/7/10 to 7/20/11) and Wayne Werner (break from 4/14/09 to 3/14/10); *id.*, Ex. 2, Carson Decl. ¶ 10.)

[7] Berglund says some of these 60+ breaks were, in fact, shorter because it uses the date on which the company decides to call a carpenter back to work as the "end of break date" not the date he or she actually begins working. (*See* Def.'s LR 56.1(b)(3)(C) Stmt., Ex. 7, Geshwender Decl. ¶ 5.) Berglund does not, however, identify the 60+ breaks that are artifacts of its accounting methods. Thus, the Court has not excluded any 60+ break on this basis.

[8] (*See* Defs,' LR 56.1(b)(3)(C) Stmt., Ex. 5, Table of Hires, Brian Anderson (63-day break from 3/31/08 to 6/1/08), Mike Cantrell (83-day break from 9/9/08 to 11/30/08 and 99-day break from 2/15/09 to 5/24/09), Vincente Carbajal (78-day break from 4/6/08 to 6/22/08), Jim Costello (66-day break from 2/8/08 to 4/16/09 and 78-day break from 1/10/10 to 3/28/10), James Crocker (77-day break from 1/4/11 to 3/21/11), Bobby Davis (224-day break from 1/6/08 to 8/17/08 and 97-day break from 8/26/08 to 11/30/08), Tom Duncan (67-day break from 2/1/09 to 4/10/09), Ismael Estrada (92-day break from 2/22/09 to 5/24/09), Kenneth Fowler (65-day break from 2/8/09 to 4/15/09),William Fritz (62-day break from 2/8/09 to 4/12/09), John Kennedy (71-day break from 1/24/10 to 4/4/10), Stephan Mann (75-day break from 2/8/09 to 4/23/09 and 70-day break from 5/3/09 to 7/15/09), Dennis Miller (69-day break from 4/3/12 to 6/10/12), John Mosca (239-day break from 9/23/07 to 5/18/08), Jason Myers (62-day break from 4/6/08 to 6/6/08), Scott Pitrowski (85-day break from 3/1/09 to 5/24/09), Shiloh Rhodes (113-day break from 4/13/08 to 8/3/08, 92-day break from 8/24/08 to 11/23/08, 78-day break from 1/18/09 to 4/5/09 and 166-day break from 2/3/10 to 7/18/10), Norge Roi (102-day break from 1/18/09 to 4/19/09), Jeffrey Roth (101-day break from 3/28/08 to 7/6/08), Rog Slawomir (274-day break from 2/22/09 to 11/22/09),William Walzak (69-day break from 5/24/11 to 7/31/11) and Alexander Wilcox (78-day break from 9/14/08 to 11/30/08).)

[9] The vast majority of these alleged testing lapses occurred more than 300 days before the Union filed its EEOC Charge, *i.e.*, before January 8, 2010. (*See* Def.'s LR 56.1(b)(3)(C) Stmt., Ex. 5, Table of Hires; *id.*, Ex. 4, EEOC Charge.) These alleged lapses are actionable, however, under a continuing violation theory. *See Tinner v. United Ins. Co. of Am.*, 308 F.3d 697, 707 (7th Cir. 2002) (stating that a continuing violation exists when "discrete acts of discrimination are part of an ongoing pattern" and all of the acts are actionable if "at least one of [them] occurred within the relevant limitations period").

issue of fact as to whether its test policy falls into the ADA's post-offer testing exception. *See* 42 U.S.C. § 12112(b).

Nonetheless, Berglund can still prevail on this claim if there is no dispute that the contested medical exam is "job-related and consistent with business necessity." 29 C.F.R. § 1630.15(b). It is undisputed that in 2007, "as part of its efforts to maintain a safe workplace," Berglund hired Accelerated to analyze jobs performed by Berglund employees, including carpenters, and prepare a post-offer evaluation process to determine whether candidates for those jobs were capable of performing them safely. (Pls.' LR 56.1(b)(3)(B) Stmt. ¶¶ 5-6.) After observing Berglund employees at work, Accelerated concluded, among other things, that carpenters were required to lift: (1) objects weighing 70 pounds from the floor to thirty inches above it and those weighing 88 pounds from the floor to their waists frequently, *i.e.*, 33-66% of a work day; and (2) objects weighing 84 and 92 pounds, respectively, from the floor to over their heads frequently to constantly, *i.e.*, 67-100% of a work day. (*Id.* ¶ 7; *see* Def.'s LR 56.1(a) Stmt., Ex. 5, On Site Job Analysis.)[10] Thereafter, Acceleration designed an evaluation for the carpenter position consisting of five tasks: (1) repeatedly climbing a ladder wearing a 15-pound tool belt without exceeding 85% of maximum heart rate; (2) repeatedly picking up 3/4 inch 4x8 plywood from the ground, carrying it 15 feet and placing it on the ground while wearing a 15-pound tool belt; (3) repeatedly lifting a 75-pound box from the ground and carrying it 15 feet; (4) repeatedly walking across 4-inch hollow risers without losing balance; and (5) repeatedly disassembling and reassembling a Bennet Tool Box from the

---

[10]Plaintiffs object to this exhibit as inadmissible hearsay. (*See* Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 7.) However, evidence in support of a summary judgment motion must be admissible in substance, not form. *See Winskunas v. Birnbaum*, 23 F.3d 1264, 1267-68 (7th Cir. 1994). Because the author of the analysis could testify about the observations and conclusions that are in it, the Court can consider them on this motion in their hearsay form.

ground position. (*See* Def.'s LR 56.1(a) Stmt., Ex. 8, Job Specific Tasks.) Plaintiffs admit that these tasks are representative of those performed by Berglund carpenters. (Pls.' LR 56.1(b)(3)(B) Stmt. ¶¶ 4, 13, 15, 19.)

After Accelerated designed the evaluation, Berglund adopted its post-offer testing policy, which states that an employment offer is "contingent upon the [candidate's] successful completion" of the evaluation and will be withdrawn if a candidate fails the test, unless he has a documented disability and with a reasonable accommodation can perform the essential functions of the job. (*See* Def.'s LR 56.1(a) Stmt., Ex. 7, Policy.) Plaintiffs do not identify any union member who requested, let alone was refused, an accommodation from Berglund. Moreover, plaintiffs do not dispute that since Berglund enacted the policy, its rate of Occupational Health and Safety Administration reportable incidents per 200,000 man hours fell from 2.27 to 0.87. (Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 28.)

In short, the undisputed evidence shows that the Accelerated evaluation is "job-related and consistent with business necessity." Thus, defendant is entitled to judgment as a matter of law on plaintiffs' Count II claim.

**Conclusion**

For the reasons set forth above, the Court grants plaintiffs' motion to reconsider the September 13, 2013 ruling on the parties' motions for summary judgment with respect to the ADA claim in Count II [77] and vacates the portion of the September 13, 2013 order and judgment [75 & 76] pertaining to that claim. Having reconsidered the claim, the Court concludes that there is no genuine issue of material fact as to whether Berglund violated the ADA, and thus denies plaintiffs' motion for summary judgment on that claim, grants defendant's motion for summary judgment on that claim and enters judgment in defendant's favor on it. This case is terminated.

**SO ORDERED.**  ENTERED: December 11, 2013

_____
**HON. RONALD A. GUZMAN**
**United States District Judge**